UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

--------------------------------------------------------X

AMADOR DE JESUS, on behalf of himself
and others similarly situated,

     Plaintiff,

  -against-

           **REPORT AND**
           **RECOMMENDATION**
           20-CV-6305 (MKB) (TAM)

GREGORYS COFFEE MANAGEMENT,
LLC and GREGORY ZAMFOTIS,

     Defendants.

--------------------------------------------------------X

**TARYN A. MERKL**, United States Magistrate Judge:

Plaintiff Amador De Jesus ("Plaintiff") initiated this action on behalf of himself

and others similarly situated against Defendants Gregorys Coffee Management, LLC

("Gregorys Coffee") and Gregory Zamfotis (collectively, "Defendants") on December

29, 2020. (Complaint ("Compl."), ECF No. 1.) Plaintiff alleges claims for violations of the

Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* ("FLSA"), and New York Labor Law

("NYLL"), Art. 6 § 190 *et seq.* and Art. 19 § 650 *et seq.* (*Id.*) On October 15, 2021,

Defendants filed a motion to compel arbitration. (*See* Defs.' Mot. to Compel Arbitration,

ECF No. 33.) On November 29, 2021, Chief Judge Margo K. Brodie ordered an

evidentiary hearing on the validity and unconscionability of the relevant arbitration

agreements, which she referred to the undersigned Magistrate Judge. (*See* Mem. and

Order, ECF No. 45, at 1; Nov. 29, 2021 ECF Order.) Based on the findings of fact and

conclusions of law set forth below, the Court recommends finding that the arbitration

agreements are valid and not unconscionable.

## FACTUAL AND PROCEDURAL HISTORY

**I.    Plaintiff's Complaint**

As noted above, Plaintiff Amador De Jesus initiated this action on December 29, 2020. (*See* Compl., ECF No. 1.) Plaintiff alleges that Defendants employed him to work as a cook and baker from January 2014 until March 17, 2020. (*Id.* ¶ 23.) Plaintiff alleges that from January 2014 until in or about January 2017, he worked sixty (60) hours per week for six (6) days a week. (*Id.*) He also alleges that from in or about January 2017 until March 17, 2020, he regularly worked fifty-four (54) hours per week for six (6) days per week. (*Id.*) Plaintiff avers that he "was never paid the overtime premium of one-and-one-half times his regular rate of pay for [his] hours worked in excess of forty (40) [hours] per week, as required under the FLSA and NYLL." (*Id.* ¶ 24.) Additionally, according to Plaintiff, he "was required to clock out for a thirty (30) minute meal break every day" but he "was required to work through his break . . . ." (*Id.* ¶ 25.) Plaintiff further contends that he "was not paid for such off-the-clock work." (*Id.*) Similarly, Plaintiff alleges that he "was required to clock out at the end of his shift, but was then required to continue working," for which he likewise was not paid. (*Id.* ¶ 26.) Additionally, Plaintiff claims that other non-exempt employees are and have been similarly situated. (*Id.* ¶ 12.)

**II.    Defendants' Motion to Compel Arbitration**

In August of 2021, around eight months after Plaintiff filed his complaint, Gary Barnes, chief of staff at Gregorys Coffee, learned that Plaintiff and other Gregorys Coffee employees had signed arbitration agreements. (*See* Oct. 15, 2021 Barnes Decl., ECF No. 40, ¶ 3; Jan. 13, 2022 Hearing Transcript ("Tr."), ECF No. 48, at 50:1–5; Compl., ECF No. 1.) Specifically, Plaintiff signed two arbitration agreements during his employment. (*See* 2018 Arbitration Agreement, ECF No. 34-1; 2019 Arbitration

2

Agreement, ECF No. 34-2.) Prior to the evidentiary hearing, Plaintiff stated in a sworn declaration that he recalled "receiving some papers in English after years of working for Defendants," and that he "was told that [he] had to sign the documents to continue working for Defendants, which [he] did." (De Jesus Decl., ECF No. 38, ¶ 3.) Plaintiff further stated: "I do not have any recollection of an arbitration agreement being provided by Defendants. The first I recall hearing of this agreement was from my attorneys." (*Id.* ¶ 4.) Plaintiff also stated that his primary language is Spanish and that he is incapable of reading English. (*Id.* ¶ 2.)

On August 10, 2021, Defendants filed a motion for a pre-motion conference, requesting permission to file a motion to dismiss the complaint and to enforce the arbitration agreements. (Defs.' Mot. for Pre-Mot. Conference, ECF No. 25.) On August 20, 2021, Chief Judge Brodie set a briefing schedule for Defendants' motion to dismiss and granted Defendants' request to submit further briefing on how the arbitration agreements might impact Plaintiff's then-pending motion for conditional certification of an FLSA collective action. (Aug. 20, 2021 ECF Order.)[1] On September 27, 2021, Plaintiff filed a cross-motion for sanctions and attorney's fees. (Pl.'s First Cross-Mot., ECF No. 30.)[2] On October 15, 2021, Defendants filed their motion to compel arbitration, which Plaintiff opposes. (*See* Defs.' Mot. to Compel Arbitration, ECF No. 33; Defs.' Mem. in Supp., ECF No. 34; Pl.'s Mem. in Opp'n, ECF No. 36; Oct. 15, 2021 Lee Decl., ECF No.

---

[1] On July 23, 2021, Plaintiff filed a motion to certify an FLSA collective action, which Defendants opposed. (*See* Pl.'s Mot. to Certify Collective Action, ECF No. 20; Pl.'s Mem. in Supp., ECF No. 21; Defs.' Mem. in Opp'n, ECF No. 22; Pl.'s Reply Mem. in Supp., ECF No. 23; July 23, 2021 Lee Decl., ECF No. 24; *see also* Defs.' Supp. Mem. in Opp'n, ECF No. 43 (filed on Oct. 15, 2021).) On March 31, 2022, the Court deferred ruling on Plaintiff's motion to certify an FLSA collective action until after the motion to compel arbitration is decided. (*See* March 31, 2022 ECF Order.)

[2] Plaintiff re-filed his cross-motion for sanctions and attorney's fees and a reply in support of his cross-motion on October 15, 2021. (Pl.'s Second Cross-Mot., ECF No. 35; Pl.'s Reply in Supp. of Cross-Mot., ECF No. 41.)

37; De Jesus Decl., ECF No. 38; Defs.' Reply in Supp., ECF No. 39; Oct. 15, 2021 Barnes Decl., ECF No. 40; *see also* Oct. 18, 2021 Barnes Decl., ECF No. 44.)

As noted above, on November 29, 2021, Chief Judge Brodie ordered "an evidentiary hearing to determine whether the Arbitration Agreements are procedurally and/or substantively unconscionable," which hearing she referred to the undersigned Magistrate Judge. (Nov. 29, 2021 ECF Order; *see also* Mem. and Order, ECF No. 45.) On December 7, 2021, the Court scheduled the evidentiary hearing for January 13, 2022. (*See* Dec. 7, 2021 ECF Notice of Hearing; *see also* Jan. 3, 2022 ECF Notice of Hearing.) On January 4, 2022, Plaintiff filed a motion to compel Defendants to produce Gary Barnes and George Zamfotis as witnesses at the evidentiary hearing, which Defendants did not oppose. (Pl.'s Mot. to Compel, ECF No. 46; Defs.' Resp. to Pl.'s Mot. to Compel, ECF No. 47.) The Court held the evidentiary hearing via video on January 13, 2022. (Jan. 13, 2022 ECF Minute Entry and Order; *see also* Tr., ECF No. 48.)

Plaintiff argues that the arbitration agreements are unconscionable because of a language barrier and because, he claims, Defendants misrepresented what the agreements were. More specifically, Plaintiff contends that he "is incapable of reading and understanding any legal document written in English," and that Defendants told him they were "documents" he needed to sign for work, leading Plaintiff to believe that they were required work papers, such as liability waivers, tax forms, and wage notices. (Pl.'s Mem. in Opp'n, ECF No. 36, at 11.)

## FINDINGS OF FACT

Chief Judge Brodie's order directing the evidentiary hearing observed that: "[T]here [wa]s insufficient information available as to the circumstances under which Defendants provided Plaintiff with [the arbitration agreements], whether there was a misrepresentation of the documents, or whether there were any indicators of

procedural unconscionability . . . ." (Mem. and Order, ECF No. 45, at 12.) Accordingly, the evidentiary hearing sought to determine whether the arbitration agreements are procedurally and/or substantively unconscionable. (Jan. 13, 2022 ECF Minute Entry and Order.) Four witnesses testified at the hearing: George Zamfotis, Gary Barnes, Alberto Vasquez, and Plaintiff Amador De Jesus.[3] (Tr. at 2.) The evidence adduced at the hearing established the following facts.

## I. Parties and People Involved

### A. George Zamfotis

George Zamfotis was the manager of the commissary for Gregorys Coffee during the relevant time frame.[4] (*See* Oct. 15, 2021 Barnes Decl., ECF No. 40, ¶ 5; *see also* Tr. at 13:4–9, 13:17–19 (Zamfotis).) Mr. Zamfotis has been working for Gregorys Coffee for fifteen years and was one of the founders of the company. (Tr. at 12:21–23, 13:15–16.) As a manager of the commissary, Mr. Zamfotis supervised Plaintiff. (Tr. at 34:20–23.) Mr. Zamfotis has an equity interest in Gregorys Coffee. (Tr. at 13:20–24.) Mr. Zamfotis signed the 2018 and 2019 arbitration agreements at issue in this case. (Tr. at 14:22–15:17, 37:4–7; *see also* 2018 Arbitration Agreement, ECF No. 34-1; 2019 Arbitration Agreement, ECF No. 34-2.)

---

[3] Citations to the hearing transcript herein are designated by "Tr." and include a parenthetical reference to the testifying witness each time a new witness is cited. Subsequent transcript references are attributable to the witness who was previously identified parenthetically unless otherwise indicated. For example, a paragraph summarizing the testimony of Mr. Barnes includes "(Barnes)" when his testimony is first cited, and all subsequent transcript references refer to Mr. Barnes until a different witness's testimony is indicated. The testimony of the witnesses is contained on the following transcript pages: George Zamfotis, 12 to 44; Gary Barnes, 44 to 55; Alberto Vasquez, 55 to 70; and Amador De Jesus, 71 to 85.

[4] As used here, the Gregorys Coffee commissary was, essentially, the commercial kitchen where Gregorys Coffee employees prepared, cooked, and stored food and equipment. (*See* Tr. at 34:5–15, 34:24–35:24, 66:23–24.)

### B. Gary Barnes

Gary Barnes is the chief of staff for Gregorys Coffee. (*See* Oct. 15, 2021 Barnes Decl., ECF No. 40, ¶ 2; *see also* Tr. at 45:16–17 (Barnes).) Mr. Barnes has been working for Gregorys Coffee for approximately seven years. (Tr. at 45:18–46:5.) As chief of staff, Mr. Barnes oversees the company's build-outs, tech and innovation, and new, ongoing projects. (Tr. at 46:18–21.) While Mr. Barnes is not currently responsible for payroll or employees, Mr. Barnes has been responsible for payroll, hiring, and onboarding in the past. (Tr. at 47:1–17.) Mr. Barnes became aware of the complaint in this case at some point between April and June of 2021, and began looking for documents related to Plaintiff's claims. (Tr. at 48:5–21.) While looking for documents, Mr. Barnes never found the 2018 and 2019 arbitration agreements; Mr. Zamfotis provided Mr. Barnes with the agreements. (Tr. at 53:12–21; *see also* Oct. 15, 2021 Barnes Decl., ECF No. 40, ¶ 8.) Before Mr. Zamfotis provided him with the arbitration agreements, Mr. Barnes had not seen them before and did not know about them. (Tr. at 53:12–21 (Barnes).) Mr. Barnes never directly worked with Plaintiff. (Tr. at 53:5–6.)

### C. Alberto Vasquez

Alberto Vasquez is also a manager of the commissary at Gregorys Coffee. (Tr. at 34:3–15 (Zamfotis); 56:22–23, 57:7–9 (Vasquez).) Mr. Vasquez has been working for Gregorys Coffee for seven years. (Tr. at 56:24–25 (Vasquez).) Mr. Vasquez's job duties include ensuring "that all the items go out on time, all the items are produced in the manner that [Gregorys Coffee] want[s], that the place is kept clean, that people come to work." (Tr. at 34:10–13 (Zamfotis).) If there were any problems with employees, Mr. Vasquez would tell Mr. Zamfotis. (Tr. at 34:14–15.) Mr. Vasquez worked directly with Plaintiff at the commissary, was his boss, and had the power to fire him. (Tr. at 59:6–8, 68:8–12 (Vasquez).)

### D.  Amador De Jesus

Plaintiff Amador De Jesus was a dishwasher and then a baker at Gregorys Coffee. (Tr. at 76:6–17 (De Jesus); *see also* Tr. at 35:2–3, 40:2–3 (Zamfotis).) Plaintiff worked for Gregorys Coffee for almost seven years. (Tr. at 76:2–5, 7 (De Jesus).) Plaintiff testified that, during his employment, he never spoke to Mr. Zamfotis. (Tr. at 78:1–5.) Plaintiff said that he did speak to Mr. Vasquez. (Tr. at 78:4–8.)

## II.  Discussion Between George Zamfotis and Alberto Vasquez Regarding the Arbitration Agreements

The testimony at the hearing showed that Mr. Zamfotis received the 2018 arbitration agreement from his accountant. (Tr. at 15:24 (Zamfotis).) Mr. Zamfotis's accountant called him and indicated that he had a client who had employment issues and suggested that Mr. Zamfotis use the arbitration agreement. (Tr. at 15:24–16:2.) Mr. Zamfotis's understanding of the 2018 arbitration agreement was that "if we have any dispute, that we're not going to go [to] court and involve, you know, lawyers and judges because that's very expensive, that we would get an arbitrator, unbiased arbitrator, who would decide." (Tr. at 18:6–11.)[5]

Mr. Zamfotis gave the 2018 arbitration agreement to Mr. Vasquez. (Tr. at 15:18–22.) Mr. Zamfotis generally explained to Mr. Vasquez what the 2018 arbitration agreement was. (Tr. at 16:21–23.) Mr. Zamfotis testified that when explaining the 2018 arbitration agreement to Mr. Vasquez, he "made it very simple" because "he didn't want to make it too complicated for him." (Tr. at 17:11–12.) Mr. Zamfotis told Mr. Vasquez "to make sure [employees] understand what it says basically." (Tr. at 16:6–9

---

[5] Mr. Zamfotis also testified that the 2018 arbitration agreement indicated that whatever rules were in effect in New York at the time of the signing of the agreement would apply. (*Id.* at 19:1–7.) Mr. Zamfotis explained that based on the 2018 arbitration agreement, Gregorys Coffee would select an arbitrator by doing research, getting in touch with a lawyer, and figuring out the rules. (*Id.* at 20:13–24.)

(Zamfotis); *see also* Tr. at 62:11–14 (Vasquez).) Mr. Zamfotis instructed Mr. Vasquez to give out the arbitration agreements for both years at the commissary. (Tr. at 22:19–23:4 (Zamfotis); Tr. at 61:3–5 (Vasquez).) Mr. Zamfotis also told Mr. Vasquez to "give them the forms and, you know, let them sign it. But if they said, I don't want to sign it, then they didn't have to sign it." (Tr. at 28:19–23 (Zamfotis).) Mr. Zamfotis testified that he never informed Mr. Vasquez to instruct Plaintiff that he needed to sign the arbitration agreements to continue working for the company. (Tr. at 36:24–37:3, 38:13–16.)

III.    **Plaintiff's Signing of the Arbitration Agreements**

    **A. Hearing Testimony**

        1.  Circumstances Under Which Plaintiff Signed the Agreements

The evidence at the hearing established that Mr. Vasquez distributed the arbitration agreements to the employees who worked at the commissary. (Tr. at 15:18–22, 22:3–7 (Zamfotis); Tr. at 69:20–22 (Vasquez).) Mr. Vasquez testified that he called the employees, including Plaintiff, one by one into the office to explain the arbitration agreements to them.[6] (Tr. at 62:15–21 (Vasquez); *see also* Tr. at 17:13–14, 36:9 (Zamfotis).) Along with the 2018 arbitration agreement, Mr. Vasquez gave Plaintiff a wage notice in Spanish and English, which Mr. Vasquez did not explain to Plaintiff, but which Plaintiff read and signed. (Tr. at 64:12–21 (Vasquez).)

Mr. Vasquez testified that he read the arbitration agreements to Plaintiff and told Plaintiff that if he ever had a dispute or if something happens, "it's to be arbitration." (Tr. at 61:15–21; *see also* Tr. at 62:20–21, 63:17–20, 66:7–12, 68:2–7.) According to Mr. Vasquez, Plaintiff responded "okay." (Tr. at 61:21.) Mr. Vasquez testified that he did not

---

    [6] Mr. Vasquez testified that he felt qualified to explain the provisions in the 2018 arbitration agreement to employees, but not 100% qualified. (Tr. at 67:5–11 (Vasquez).)

tell Plaintiff that he had to sign the arbitration forms in order to continue working. (Tr. at 65:7–9.)[7] Mr. Vasquez also testified that he never told Plaintiff that "he could sign or not sign." (Tr. at 67:12–14.) Mr. Vasquez testified that Plaintiff signed the arbitration agreements "probably in the office." (Tr. at 58:5–9.) Mr. Vasquez testified that all employees sign an arbitration agreement every year. (Tr. at 61:6–14, 69:17–19.) Plaintiff signed the 2018 arbitration agreement on January 15, 2018. (2018 Arbitration Agreement, ECF No. 34-1; Tr. at 72:23–25 (De Jesus).) Plaintiff signed the 2019 arbitration agreement on January 18, 2019. (2019 Arbitration Agreement, ECF No. 34-2; Tr. at 73:24–74:2.)

Mr. Zamfotis testified that employees at the commissary were not required to sign the arbitration agreements to continue their employment. (Tr. at 23:5–9 (Zamfotis).) More specifically, Mr. Zamfotis testified that in "no way" were employees encouraged to sign the arbitration agreements and in "no way" did they have to sign them. (Tr. at 28:13–18.) Mr. Zamfotis further explained that he did not want to be present when Plaintiff signed the agreement "for the simple fact that [he] didn't want him to think that he had to sign it." (Tr. at 23:14–18.) In addition, Mr. Zamfotis testified that he never pressured Plaintiff to sign the arbitration agreements and that he cannot think of any way that he coerced Plaintiff to sign the arbitration agreements. (Tr. at 40:17–20, 40:23–41:2.)

Once an employee signed an arbitration agreement, Mr. Vasquez gave it to Mr. Zamfotis and Mr. Zamfotis signed it. (Tr. at 37:4–7, 38:6–8 (Zamfotis).) Once the

_____

[7] At one point during questioning, in reference to distributing arbitration agreements to the employees, Mr. Vasquez testified as follows: "Q. And you're the person that tells them they have sign it? A. Yes." (Tr. at 69:23–25 (Vasquez).) Although arguably contradictory with his prior testimony that he did not tell Plaintiff he was required to sign the arbitration agreements to continue working for Gregorys Coffee, the Court credits Mr. Vasquez's prior explanation of what he did, which was offered in his own words, and places less weight on his simple "yes," in response to a series of rapid questions at the conclusion of his testimony. (*See* Tr. at 69:17–25.)

agreements were fully signed, Mr. Zamfotis made copies of the agreements and gave the original agreements back to Mr. Vasquez, who then gave the original agreements back to the employees. (Tr. at 37:8–11; 38:17–25.) After Plaintiff received his copy of the arbitration agreements, Plaintiff never went to Mr. Zamfotis to express any concerns with respect to the arbitration agreements. (Tr. at 37:16–18, 39:1–6 (Zamfotis); Tr. at 79:18–21, 81:15–82:2 (De Jesus).) Mr. Zamfotis testified that he had no contact with Plaintiff about the arbitration agreements at all. (Tr. at 37:19–21 (Zamfotis).) Mr. Zamfotis further testified that employees never came to him to ask questions about the arbitration agreements. (Tr. at 26:14–17.)

   Plaintiff's version of events varied in material respects from the testimony offered by Mr. Zamfotis and Mr. Vasquez. At the hearing, Plaintiff offered detailed testimony regarding having received and signed the arbitration agreements.[8] (Tr. at 72:12–18 (De Jesus).) According to Plaintiff, Mr. Vasquez handed the arbitration agreements to all the workers at the same time in the kitchen, not the office, and they signed it the same day. (Tr. at 78:16–20, 81:2–5.) Plaintiff also testified that the bottom part of the 2018 arbitration agreement, where the employer was supposed to sign, was not filled out when Plaintiff signed the agreement. (Tr. at 73:1–4.) Plaintiff further testified Mr. Vasquez gave him both arbitration agreements to sign. (Tr. at 73:10–13, 74:9–11.)

   Plaintiff testified that each time he received an arbitration agreement, Mr. Vasquez told him "to sign those papers so [he] could keep on working for that same company." (Tr. at 74:12–15, 74:24–75:1; *see also* Tr. at 74:21–23 ("The owner says you

---

[8] This testimony is in sharp contrast to a sworn declaration submitted by Plaintiff on September 22, 2021, in which Plaintiff stated: "I do not have any recollection of an arbitration agreement being provided by Defendants. The first I recall hearing of this agreement was from my attorneys." (De Jesus Decl., ECF No. 38, ¶ 4.)

should sign these papers if you want to keep working."); Tr. at 78:14–15, 79:12–14 ("Well what he said was that you all have to sign these papers in order to be able to keep working here and if not, then you'll have to find a new job.") (edited for typographical error); Tr. at 81:6–10.) Plaintiff further testified that Mr. Vasquez did not explain what the arbitration agreements were and that when Plaintiff asked Mr. Vasquez what the documents were, Mr. Vasquez didn't say anything. (Tr. at 74:16–19; *see also* Tr. at 78:9–15, 80:21–81:1.) Plaintiff also testified that Mr. Vasquez never provided him with a copy of the arbitration agreements. (Tr. at 79:5–8, 82:7–11.)

2.  Plaintiff's Ability to Understand English

Plaintiff has represented that his primary language is Spanish and that he is incapable of reading English. (De Jesus Decl., ECF No. 38, ¶ 2.) Plaintiff testified during the January 13, 2022 hearing that he does not speak English and is not qualified to review English-language legal documents. (Tr. at 73:5–9 (De Jesus).) Plaintiff also testified that Saul Garcia trained him to be a baker, and that Mr. Garcia or Mr. Vasquez would instruct him on how to make Gregorys Coffee's recipes. (Tr. at 76:24–25, 84:4–7.) According to Plaintiff, Mr. Garcia would also write the recipes in Spanish. (Tr. at 84:8–17.)

Mr. Vasquez testified that he exclusively communicated with Plaintiff in Spanish. (Tr. at 59:9–14 (Vasquez).) Mr. Vasquez also said that he thinks that Plaintiff knows a little bit of English but that he doesn't know if Plaintiff speaks English. (Tr. at 60:4–5.) As to the language of the recipes at the Gregorys Coffee's commissary, however, Mr. Vasquez testified that "but here everything is in English, the recipes." (Tr. at 60:5–6.) According to Mr. Vasquez, Plaintiff speaks a little bit of working English, but his English is not fluent. (Tr. at 60:7–13.)

Mr. Zamfotis testified that he communicated with Plaintiff only in English, and that he believes that Plaintiff does speak English. (Tr. at 24:7–15, 39:18–19, 40:13–16 (Zamfotis).) According to Mr. Zamfotis, Plaintiff did not start at Gregorys Coffee as a baker, but Mr. Zamfotis believed Plaintiff to be "a smart kid," so Mr. Zamfotis testified that he "taught him how to bake." (Tr. at 40:3, 10–12.) Mr. Zamfotis explained that he would give Plaintiff recipes in English with about 15 to 20 ingredients and Plaintiff would follow them. (Tr. at 24:4–10.) If the recipes were changed, Mr. Zamfotis stated that he would tell Plaintiff in English, that Plaintiff understood, and "did them." (Tr. at 24:10–12.) In addition, according to Mr. Zamfotis, Plaintiff's booklet for the recipes did not have a Spanish translation. (Tr. at 35:21–24.) The ovens at Gregorys Coffee have instructions in English and there is no Spanish writing at all in the commissary. (Tr. at 24:12–14.) Accordingly, Mr. Zamfotis thought that Plaintiff did speak and understand English. (Tr. at 24:14–15, 39:7–21.) As to the arbitration agreements, Mr. Zamfotis did not have a Spanish version available for employees. (Tr. at 28:24–29:1.) Plaintiff never asked for a translated copy of the 2018 arbitration agreement. (Tr. at 79:22–80:5, 80:3–5 (De Jesus).)

In contrast, Plaintiff testified that he never spoke to Mr. Zamfotis during his employment. (Tr. at 77:17–78:5, 83:23–25 (De Jesus).) Plaintiff also testified that Mr. Zamfotis did not train him to be a baker. (Tr. at 76:21–23.) Plaintiff said that if he received English-language recipes, he would give them to another employee, Saul Garcia, who would explain them to him or write them down in Spanish, or the owner (Mr. Zamfotis) would tell Mr. Vasquez, who would explain them to Plaintiff. (Tr. at 75:8–12, 75:15–16, 84:8–13.) Plaintiff testified that Mr. Zamfotis never communicated recipes to Plaintiff directly. (Tr. at 84:1–7.)

The evidence is unclear as to how well Plaintiff understands English. As discussed above, Mr. Zamfotis testified that he gave Plaintiff complex recipes and trained him to be a baker, all in English.[9] (Tr. at 24:4–10 (Zamfotis).) Mr. Vasquez, who speaks both English and Spanish, testified that Plaintiff speaks a little bit of working English but is not fluent. (Tr. at 60:7–13 (Vasquez).) On the other hand, Plaintiff steadfastly maintained that he does not speak or understand English and that he has never spoken to Mr. Zamfotis. (Tr. at 73:5–9, 77:17–78:5, 83:23–25 (De Jesus); *see also* De Jesus Decl., ECF No. 38, ¶ 2.) Plaintiff's testimony that he needed assistance from Mr. Vasquez and Mr. Garcia to understand the English recipes was not, however, corroborated by any other evidence. Mr. Zamfotis expressly testified that the recipes at Gregorys Coffee did not have a Spanish-language version, no Spanish translations were offered in evidence, and Plaintiff declined to call any other Gregorys Coffee's employees, such as Mr. Garcia, to support his testimony. (Tr. at 24:12–15, 35:18–24 (Zamfotis).)

The Court credits Mr. Vasquez's testimony that Plaintiff's English is not fluent, but given Plaintiff's employment, intelligence, and the number of years he has worked in the United States, including at a business where English is the dominant language, and where he performed a complex job, the Court does not credit Plaintiff's claim that he cannot read or understand any English.

_____

[9] Mr. Zamfotis's testimony also included, at times, unprompted observations about Plaintiff's abilities as an employee that were persuasive in establishing that Mr. Zamfotis interacted with Plaintiff at the commissary, and that Plaintiff likely understands some working English. For example, Mr. Zamfotis testified that he only communicated with Plaintiff in English, and that, based on their interactions, Mr. Zamfotis believed Plaintiff to be "a smart guy," because when working as a baker, "you have to know how to work the ovens, you have to know how to do the recipes. And more important, you have to know how to use the mixer because, you know, that's dangerous." (Tr. at 40:3–9 (Zamfotis) (describing Plaintiff as "a smart kid" and "a smart guy").)

**B. Discussion**

As a threshold matter, the Court credits Plaintiff's claim that he did not have the ability to read and fully understand the arbitration agreements in English. (*See* Pl.'s Mem. in Opp'n, ECF No. 36, at 11.) However, the Court does not credit Plaintiff's claims that Mr. Vasquez specifically told him that he had to sign the arbitration agreements to keep his job and that Mr. Vasquez declined to provide information about what the arbitration agreements meant when asked. As discussed herein, Plaintiff's claims are undermined by other evidence and lack corroboration.

First, Plaintiff's claim that he was pressured to sign the arbitration agreements is at odds with the testimony of two witnesses: Mr. Vasquez and Mr. Zamfotis. As set forth above, both Mr. Zamfotis and Mr. Vasquez testified that they did not tell Plaintiff that he had to sign the arbitration agreements to continue to work at Gregorys Coffee. (Tr. at 28:19–23, 36:24–37:3, 38:13–16 (Zamfotis); Tr. at 65:7–9, 67:12–14 (Vasquez).) There is also a notable absence of evidence as to *how* Defendants allegedly misled Plaintiff regarding the content of the agreements, as discussed further below. Moreover, Plaintiff's hearing testimony is significantly undermined by his own prior sworn declaration, in which he asserted: "I do not have any recollection of an arbitration agreement being provided by Defendants. The first I recall hearing of this agreement was from my attorneys." (De Jesus Decl., ECF No. 38, ¶ 4.) In contrast, at the hearing, Plaintiff testified in detail regarding the circumstances surrounding his signing of the arbitration agreements. (Tr. at 72:12–18, 73:1–4, 73:10–13, 74:9–19, 74:21–75:1, 78:9–20, 79:5–8, 79:12–14, 80:21–81:10, 82:7–11 (De Jesus).) In the span of less than four months, Plaintiff went from not having "any recollection" of the arbitration agreements to testifying with so much detail that he claimed to recall the location of where he signed the agreements, and that the bottom part of the 2018 arbitration agreement, where the

employer was supposed to sign, was not filled out when he signed the agreement. (*Compare* De Jesus Decl., ECF No. 38, ¶ 4, *with* Tr. at 73:1–4, 78:19–20 (De Jesus).) The Court finds it suspect that Plaintiff's testimony changed over time in a manner that might have helped his case if credited.

It is also notable that in Plaintiff's description of the circumstances surrounding the signing of the arbitration agreements, he testified that Mr. Vasquez handed the arbitration agreements to all the workers in the kitchen, not the office, and that they signed it the same day. (Tr. at 78:16–20, 81:2–5.) Despite Plaintiff's testimony that all the workers signed the agreements in the kitchen, Plaintiff did not offer any co-worker testimony at the hearing or submit any other evidence to corroborate his claims about how and where the agreements were signed, or whether Mr. Vasquez pressured the employees to sign on threat of losing their jobs. (*See* Tr. at 78:16–20.)

For all of these reasons, and as discussed further below, the Court concludes that Plaintiff has not offered sufficient credible evidence to establish (1) that Defendants affirmatively misled him about the contents of the arbitration agreements, or (2) that Defendants unduly coerced or pressured him to sign the arbitration agreements.

## CONCLUSIONS OF LAW

### I.    Legal Standards

Where the "arbitration agreement at issue contains a choice of law clause which provides that New York law will govern the agreement's construction and enforcement," the Court considers New York law regarding unconscionability. *Ragone v. Atl. Video at Manhattan Ctr.*, 595 F.3d 115, 121 (2d Cir. 2010); *see also Adams v. Suozzi*, 433 F.3d 220, 227 (2d Cir. 2005). Under New York law, a contract is unconscionable when it is "'so grossly unreasonable or unconscionable in the light of the mores and business practices of the time and place as to be unenforceable [] according to its literal

terms.'" *Ragone*, 595 F.3d at 121 (quoting *Nayal v. HIP Network Servs. IPA, Inc.*, 620 F.

Supp.2d 566, 571 (S.D.N.Y. 2009)). "Generally, there must be a showing that such a

contract is both procedurally and substantively unconscionable." *Id.*

"'The procedural element of unconscionability concerns the contract formation

process and the alleged lack of meaningful choice . . . .'" *Id.* at 121–22 (quoting *Nayal*,

620 F. Supp. 2d at 571); *see also David L. Threlkeld & Co. v. Metallgesellschaft Ltd. (London)*,

923 F.2d 245, 249 (2d Cir. 1991) (noting that the "'purpose of the unconscionability

doctrine is to prevent unfair surprise and oppression'" (quoting *Pierson v. Dean, Witter,*

*Reynolds, Inc.*, 742 F.2d 334, 339 (7th Cir. 1984))); *Clinton v. Oppenheimer & Co. Inc.*, 824 F.

Supp. 2d 476, 483 (S.D.N.Y. 2011) ("For a contract to be held unconscionable, the party

alleging the defect must generally show both substantive and procedural

unconscionability. . . . That is, the contract must unreasonably favor one party over the

other and the process of contract formation must have deprived the disadvantaged

party of meaningful choice."); *Nayal*, 620 F. Supp. 2d at 571. Procedural

unconscionability can occur when there is a "misrepresentation as to the character or

essential terms of a proposed contract, and a party signs without knowing or having a

reasonable opportunity to know of its character or essential terms." *Victorio v. Sammy's*

*Fishbox Realty Co., LLC*, No. 14-CV-8678 (CM), 2015 WL 2152703, at *14 (S.D.N.Y. May 6,

2015). Relevant factors for the Court to consider "include the commercial setting of the

transaction, the experience and education of the parties, disparity in bargaining power,

as well as whether deception, high-pressured tactics, and the use of fine print were used

to deprive the disadvantaged party of a meaningful choice." *Id.* at *12 (quotation marks

omitted). However, the fact that a plaintiff feels they have to sign an arbitration

agreement to keep their job does not make the agreement unconscionable *per se*. *Id.* at

*13.

"'[T]he substantive element [of unconscionability] looks to the content of the contract.'" *Ragone*, 595 F.3d at 122 (quoting *Nayal*, 620 F. Supp. 2d at 571). "'While determinations of unconscionability are ordinarily based on [a] conclusion that both the procedural and substantive components are present, there have been exceptional cases where a provision of the contract is so outrageous as to warrant holding it unenforceable on the ground of substantive unconscionability alone.'" *Id.* (quoting *Gillman v. Chase Manhattan Bank N.A.*, 73 N.Y.2d 1, 12 (1988)). Courts consider procedural and substantive unconscionability on a "sliding scale," meaning that "the more questionable the meaningfulness of choice, the less imbalance in a contract's terms should be tolerated and vice versa." *Simar Holding Corp. v. GSC*, 928 N.Y.S.2d 592, 595 (N.Y. App. Div. 2d Dep't 2011) (quoting *State of New York v. Wolowitz*, 468 N.Y.S.2d 131, 145 (N.Y. App. Div. 2d Dep't 1983)); *see also Hojnowski v. Buffalo Bills, Inc.*, 995 F. Supp. 2d 232, 238 (W.D.N.Y. 2014).

## II.    Analysis

### A.  The Arbitration Agreements Are Not Procedurally Unconscionable

It is settled under New York law that "'a party will not be excused from his failure to read and understand the contents'" of a contract. *Victorio*, 2015 WL 2152703, at *11 (quoting *Johnson v. Thruway Speedways, Inc.*, 407 N.Y.S.2d 81, 83 (N.Y. App. Div. 3d Dep't 1978). In addition, "New York courts have repeatedly ruled that even the fact that a prospective employee possesses an imperfect grasp of the English language will not relieve the employee of making a reasonable effort to have the document explained to him." *Ragone*, 595 F.3d at 122.

Here, Plaintiff argues that the arbitration agreements are void because Plaintiff "is incapable of reading and understanding any legal document written in English," and because Defendants told him they were "documents" he needed to sign. (Pl.'s

Mem. in Opp'n, ECF No. 36, at 11.) As to the first point, Plaintiff contends that the arbitration agreements are unconscionable because Defendants gave them to Plaintiff and told him he needed to sign despite knowing Plaintiff was not capable of understanding the agreements. (*See* Pl.'s Mem. in Opp'n, ECF No. 36, at 11 (citing De Jesus Decl., ECF No. 38, ¶¶ 2–4).) As discussed above, the Court finds that Plaintiff does speak and understand some English, although he does not appear to be fluent. As Plaintiff candidly acknowledges, however,  "[a]n inability to understand the English language, without more, is insufficient" to void a contract. (Pl.'s Mem. in Opp'n, ECF No. 36, at 11 (citing *Maines Paper & Food Service Inc. v. Adel*, 681 N.Y.S.2d 390 (N.Y. App. Div. 3d Dep't 1998)).) *See also Molina v. Coca-Cola Enterprises, Inc.*, No. 08-CV-6370, 2009 WL 1606433, at *6 (W.D.N.Y. June 8, 2009); *id.* at *8 ("Cases have consistently held that a person who does not understand English must make a reasonable effort to have an agreement made clear to him.").

   To prove unconscionability, Plaintiff must show that he was misled, or that the contents of the agreements were "'misread or misrepresented to him[.]'" *Victorio*, 2015 WL 2152703, at *11 (quoting *Pimpinello v. Swift & Co.*, 253 N.Y. 159, 163 (1930)). Plaintiff argues that because Defendants told him that the arbitration agreements were documents he needed to sign, they were somehow misrepresented. (Pl.'s Mem. in Opp'n, ECF No. 36, at 11 (arguing that Plaintiff's "belief that the documents were liability waivers, tax forms, and wage notices was understandable" because the arbitration agreements were intermingled with Plaintiff's wage notice).) Even if Defendants had used misleading or high-pressure tactics, that may not be enough to find the arbitration agreements unconscionable. *See Victorio*, 2015 WL 2152703, at *13 (finding no evidence that high pressure tactics were used but holding that "even if someone had, that would not be enough to make the agreement unconscionable"). As

discussed above, however, the Court finds that Plaintiff has not established that Defendants used misleading or high-pressure tactics to secure Plaintiff's signature on the agreements. There was no credible evidence offered to demonstrate that Plaintiff was affirmatively misled about the contents of the arbitration agreements, or that he was denied an opportunity to review and ask questions about them. Rather, the credible testimony offered by Mr. Vasquez showed that he provided the arbitration agreement each year with a brief explanation, and Plaintiff said "okay," and signed it. (Tr. at 61:21 (Vasquez).) A misunderstanding, or lack of inquiry, regarding the nature of a contract is not enough to prove procedural unconscionability.

Accordingly, the Court does not find that the arbitration agreements were induced by fraud. *See Victorio*, 2015 WL 2152703, at *14 (discussing fraud in the inducement, which may excuse a party's ignorance of the contents of a contract where "'there is a misrepresentation as to the character or essential terms of a proposed contract, and a party signs without knowing or having a reasonable opportunity to know of its character or essential terms'" (quoting *Del Turco v. Speedwell Design*, 623 F. Supp. 2d 319, 335 (E.D.N.Y. 2009))). There was simply no testimony offered at the hearing that Mr. Vasquez, Mr. Zamfotis, or anyone else at Gregorys Coffee misrepresented to Plaintiff what the arbitration agreements meant. Rather, as detailed above, Mr. Zamfotis testified that he told Mr. Vasquez "to make sure [employees] understand what [the arbitration agreements] says basically." (Tr. at 16:6–9 (Zamfotis); *see also* Tr. at 62:11–14 (Vasquez).) Mr. Vasquez testified that he read the arbitration agreements to Plaintiff and told Plaintiff that if he ever had a dispute or if something happens, "it's to be arbitration." (Tr. at 61:15–21 (Vasquez); *see also* Tr. at 62:20–21, 63:17–20, 66:7–12, 68:2–7.) According to Mr. Vasquez, in response to his explanation, Plaintiff responded "okay." (Tr. at 61:21 (Vasquez).)

Plaintiff also had a reasonable opportunity to learn about the terms of the arbitration agreements. But there was never a time, according to Plaintiff and Mr. Zamfotis, when Plaintiff went to Mr. Zamfotis to express any concerns with respect to the arbitration agreements. (Tr. at 37:16–18, 39:1–6 (Zamfotis); Tr. at 79:18–21, 81:15–82:2 (De Jesus).) Mr. Zamfotis testified that he had no contact with Plaintiff about the arbitration agreements at all. (Tr. at 37:19–21 (Zamfotis).) Plaintiff did testify that Mr. Vasquez did not explain what the arbitration agreements were and did not respond when Plaintiff asked Mr. Vasquez about the documents. (Tr. at 74:16–19 (De Jesus); *see also* Tr. at 78:9–15, 80:21–81:1.) However, given Plaintiff's original sworn statement indicating that he had no recollection of the agreements, the Court does not credit Plaintiff's hearing testimony regarding the circumstances of his signing the arbitration agreements over Mr. Vasquez's.[10] (*See* De Jesus Decl., ECF No. 38, ¶ 4.)

Finally, even if the Court fully credited Plaintiff's testimony at the hearing and found that Mr. Vasquez told Plaintiff he was required to sign the arbitration agreements to continue working at Gregorys Coffee, courts in this circuit have found that including an arbitration agreement as a condition of employment does not render it procedurally unconscionable. *See Victorio*, 2015 WL 2152703, at *13; *Nayal*, 620 F. Supp. 2d at 571 ("[E]ven if the Agreement was a form contract offered on a 'take-it-or-leave-it' basis and [the party] refused to negotiate the Arbitration Provision, this is not sufficient under New York law to render the provision procedurally unconscionable."); *Ciago v. Ameriquest Mortg. Co.*, 295 F. Supp. 2d 324, 329 (S.D.N.Y. 2003) ("The mere fact that an

---

[10] Even taking Plaintiff's statement that Mr. Vasquez ignored Plaintiff's questions regarding the documents as true, the Court finds that Plaintiff still could have asked Mr. Zamfotis or someone else working at Gregorys Coffee about the arbitration agreements. (Tr. at 74:16–19 (De Jesus).) Plaintiff has not shown "'excusable ignorance of the contents of the writing signed.'" *Hetchkop v. Woodlawn at Grassmere, Inc.*, 116 F.3d 28, 32 (2d Cir. 1997) (quoting *Agathos v. Starlite Motel*, 977 F.2d 1500, 1505 (3d Cir. 1992)).

agreement to arbitrate was required as a condition of employment, or continued employment, also is insufficient to invalidate the provision.").

For all of these reasons, the Court respectfully recommends finding that the arbitration agreements are not procedurally unconscionable.

### B. The Arbitration Agreements Are Not Substantively Unconscionable

"[A] defense of unconscionability requires both procedural and substantive unconscionability. Substantive unconscionability exists when the terms are grossly unreasonable by favoring the party seeking to enforce the contract." *Victorio*, 2015 WL 2152703, at *13 (quotation marks omitted). Generally speaking, "a mandatory arbitration clause is a reasonable means by which an employer can seek to protect itself from protracted litigation," and is not, by itself, unconscionable. *Gonzalez v. Toscorp Inc.*, No. 97-CV-8158 (LAP), 1999 WL 595632, at *3 (S.D.N.Y. 1999); *see also Gilmer v. Interstate Johnson Lane Corp.*, 500 U.S. 20, 33 (1991) ("Mere inequality in bargaining power, however, is not a sufficient reason to hold that arbitration agreements are never enforceable in the employment context."). "'When both an employer and its employees are bound to an agreement to arbitrate, when the terms of the agreement are equally applicable to both parties, and when the employer bears any unreasonable cost of the arbitration, the arbitration agreement is not unreasonably favorable to the employer.'" *Victorio*, 2015 WL 2152703, at *13 (quoting *Isaacs v. OCE Bus. Servs., Inc.*, 968 F. Supp. 2d 564, 569 (S.D.N.Y. 2013)).

Here, Gregorys Coffee is required to pay for the costs of the arbitration and both Gregorys Coffee and Plaintiff are bound to the arbitration agreements. (*See* 2018 Arbitration Agreement, ECF No. 34-1; 2019 Arbitration Agreement, ECF No. 34-2; Defs.' Reply in Supp., ECF No. 39, at 12.) The terms of the arbitration agreements are thus not unreasonably favorable to the employer. Given the Court's conclusions regarding

procedural conscionability, and given the substantive reasonableness of the arbitration agreements, the Court respectfully recommends finding that the arbitration agreements are not unconscionable.

## CONCLUSION

For the foregoing reasons, the Court respectfully recommends finding that the 2018 and 2019 arbitration agreements signed by Plaintiff are valid and not procedurally or substantively unconscionable.

\*    \*    \*    \*    \*

Any objections to this Report and Recommendation must be filed with the Clerk of the Court within fourteen days. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2); *see also* Fed. R. Civ. P. 6(a), (e) (providing the method for computing time). Failure to file objections within the specified time waives the right to appeal the District Court's order. *See, e.g.*, *Caidor v. Onondaga Cnty.*, 517 F.3d 601, 604 (2d Cir. 2008) (explaining that "failure to object timely to a . . . report [and recommendation] operates as a waiver of any further judicial review of the magistrate [judge's] decision").

**SO ORDERED.**

Dated: Brooklyn, New York
        June 9, 2022

_____
*Taryn A. Merkl*
TARYN A. MERKL
UNITED STATES MAGISTRATE JUDGE