UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------

AMADOR DE JESUS, *on behalf of himself, FLSA*
*Collective Plaintiffs and the Class*,

                              Plaintiff,                  **MEMORANDUM & ORDER**
                                                          20-CV-6305 (MKB) (TAM)

                  v.

GREGORYS COFFEE MANAGEMENT, LLC,
and GREGORY ZAMFOTIS,

                              Defendants.

--------------------------------------------------------------

MARGO K. BRODIE, United States District Judge:

         Plaintiff Amador De Jesus, on behalf of himself and others similarly situated,

commenced the above-captioned class and collective action against Defendants Gregorys Coffee

Management, LLC ("Gregorys Coffee"), and Gregory Zamfotis on December 29, 2020, alleging

violations of the Fair Labor Standards Act and the New York Labor Law.  (Compl., Docket

Entry No. 1.)  On September 17, 2021, Defendants moved to compel arbitration, asserting that

Plaintiff must arbitrate his employment claims, and Plaintiff opposed the motion and moved for

attorneys' fees.[1]  By Memorandum and Order dated November 29, 2021, the Court ordered an

evidentiary hearing (the "Hearing") regarding the validity and unconscionability of the

arbitration agreements signed by Plaintiff in 2018 and 2019 (the "Arbitration Agreements") and

deferred ruling on all other arguments presented by the parties.  (Mem. & Order dated Nov. 29,

---

[1]  (Defs.' Mot. to Compel Arb. ("Defs.' Mot."), Docket Entry No. 33; Defs.' Mem. in
Supp. of Defs.' Mot. ("Defs.' Mem."), Docket Entry No. 34; Pl.'s Opp'n to Defs.' Mot. and Mot.
for Att'ys' Fees ("Pl.'s Opp'n"), Docket Entry No. 36; Defs.' Reply in Supp. of Defs.' Mot.
("Defs.' Reply"), Docket Entry No. 39; Pl.'s Reply in Supp. of Pl.'s Mot. for Att'ys' Fees ("Pl.'s
Reply"), Docket Entry No. 41.)

2021 ("November 2021 Order"), Docket Entry No. 45.)  The Court referred the Hearing to

Magistrate Judge Taryn A. Merkl, (Order dated Nov. 29, 2021), who conducted the Hearing on

January 13, 2022, (Min. Entry dated Jan. 13, 2022).  On June 9, 2022, Judge Merkl issued a

Report and Recommendation recommending that the Court find that the Arbitration Agreements

are valid and neither procedurally nor substantively unconscionable (the "R&R").  (R&R dated

June 9, 2022, Docket Entry No. 51.)

   For the reasons explained below, the Court adopts the R&R and grants Defendants'

motion to compel arbitration.

**I. Background**

   **a. Plaintiff's claims**

   Gregorys Coffee operates a chain of coffee shops.[2]  Defendants' warehouse supplier (the

"Warehouse") prepares all of the pastries and baked goods sold at Gregorys Coffee shops.

(Compl. ¶ 6.)

   In January of 2014, Defendants employed Plaintiff to work as a cook and baker at the

Warehouse, which is located in Long Island City, New York.  (*Id.* ¶ 23.)  From the beginning of

his employment until in or about January of 2017, Plaintiff worked sixty hours per week: ten

hours per day, from 6:00 AM to 4:00 PM, for six days a week.  (*Id.*)  From in or about January of

---

[2]  The Court assumes the truth of the factual allegations in the Complaint for the purposes
of this Memorandum and Order.  In addition to the Complaint, the facts are taken from the
Declaration of Amador De Jesus, ("Pl.'s Decl."), Docket Entry No. 38; the Declaration of Gary
Barnes, Chief of Staff of Gregorys Coffee, ("Barnes Decl."), Docket Entry No. 44; the exhibits
attached to the parties' papers; and the transcript of the Hearing before Judge Merkl on January
13, 2022, ("Hr'g Tr."), Docket Entry No. 48.  A court may consider documents outside of the
pleadings for the purposes of determining the arbitrability of a dispute.  *Murphy v. Canadian
Imperial Bank of Com.*, 709 F. Supp. 2d 242, 244 n.2 (S.D.N.Y. 2010) (first citing *Sphere Drake
Ins. Ltd. v. Clarendon Nat'l Ins. Co.*, 263 F.3d 26, 32–33 (2d Cir. 2001); and then citing *BS Sun
Shipping Monrovia v. Citgo Petrol. Corp.*, No. 06-CV-839, 2006 WL 2265041, at *3 (S.D.N.Y.
Aug. 8, 2006)).

2017 until the end of his employment with Defendants on March 17, 2020, Plaintiff regularly

worked fifty-four hours per week: nine hours per day, from 6:00 AM to 3:00 PM, six days per

week.  (*Id.*)  Throughout Plaintiff's employment, Defendants required Plaintiff to work through

his thirty-minute meal break at least twice a week even though Plaintiff clocked out for his

break.  (*Id.* ¶ 25.)  Defendants did not pay Plaintiff for this time.  (*Id.*)  In addition, Defendants

required Plaintiff to clock out at the end of his shift but also required him to keep working

without pay for approximately thirty minutes, three times a week.  (*Id.* ¶ 26.)  Defendants never

paid Plaintiff the spread of hours premium for each workday exceeding ten hours and Plaintiff

did not receive a notice of pay rate.  (*Id.* ¶¶ 27–28.)  From the beginning of his employment until

in or about January of 2017, Defendants paid Plaintiff a fixed salary of $550.00 per week

regardless of hours worked.  (*Id.* ¶ 23.)  From in or about January of 2017 until in or about

January of 2020, Defendants paid Plaintiff $15.00 per hour.  (*Id.*)  From January of 2020 until

March 17, 2020, when Defendants terminated Plaintiff's employment, Defendants paid Plaintiff

$15.50 per hour.  (*Id.*)  Defendants paid Plaintiff in a combination of checks and cash.  (*Id.*)

Based on Plaintiff's direct observations and conversations, other non-exempt employees are and

have been similarly situated.  (*Id.* ¶ 12.)

### i.   2018 and 2019 Arbitration Agreements

Plaintiff signed two arbitration agreements during his employment.  The first was

signed on January 15, 2018, and reads:

> You agree as a condition and in consideration for new or continued
> employment that any dispute or claim that arises out of or that relates
> to your employment, or that arises out of or that is based upon the
> employment relationship (including but not limited to any wage
> claim, FLSA or NYLL claim, any claim for wrongful termination,
> or any claim based upon any statue [sic], regulation, or law,
> including those dealing with employment discrimination, sexual
> harassment, civil rights, age, or disabilities), shall be resolved by

arbitration in accordance with the then effective arbitration rules of the State of New York.  The arbitration is of no cost to you and will be resolved on a case by case basis to be overseen by an independent and impartial arbitrator.  You will have the opportunity to select one arbitrator from a list to be provided.  Accordingly, you are hereby notified that you will be unable to seek class certification or class action status via the filing [of] any lawsuit regarding the above-mentioned claims.  The decision of the arbitrator will be final and will wholly resolve the aforementioned dispute.

(Arbitration Agreement dated Jan. 15, 2018 ("2018 Arbitration Agreement"), annexed to Defs.' Mem. as Ex. A, Docket Entry No. 34-1.)  Plaintiff signed a second agreement on January 18, 2019, which is substantially identical to the 2018 Arbitration Agreement.  (Arbitration Agreement dated Jan. 18, 2019 ("2019 Arbitration Agreement"), annexed to Defs.' Mem. as Ex. B, Docket Entry No. 34-2.)

When presented with the Arbitration Agreements, which were written in English, Defendants told Plaintiff that he "had to sign the[m] to continue working for Defendants," which he did.  (Pl.'s Decl. ¶ 3.)  Plaintiff's primary language is Spanish and he is incapable of reading English.  (*Id.* ¶ 2.)

In August of 2021, Gary Barnes, Chief of Staff of Gregorys Coffee, learned that Plaintiff and other Gregorys Coffee employees had signed the Arbitration Agreements.  (Barnes Decl. ¶ 3.)  Barnes immediately provided copies to Plaintiff's counsel.  (*Id.*)  Barnes later learned that a manager had utilized arbitration agreements in the "commissary," where Plaintiff worked, for a period of time several years ago, and that no other Gregorys Coffee employees were ever required to sign them.  (*Id.* ¶ 4.)  The Arbitration Agreements were also signed by George Zamfotis, a non-party to this action, who was the manager of the commissary for Gregorys Coffee at the time that the agreements were executed.  (*Id.* ¶ 5.)  Zamfotis stepped away from day-to-day management in March of 2020 and took on other roles within Gregorys Coffee.  (*Id.* ¶ 6.)  From approximately March until September of 2020, Matt Delaney oversaw the commissary

and rearranged numerous items and files in the commissary and destroyed other documents,

including personnel files.  (*Id.* ¶ 7.)  In May of 2020, Gregorys Coffee moved its main offices

and many files and records were "boxed up," while others were "misplaced and lost in the

move."  (*Id.* ¶ 11.)  In September of 2020, Defendants fired Delaney.  (*Id.* ¶ 7.)  Following

Delaney's termination, Zamfotis returned to his role in managing the commissary.  (*Id.* ¶ 8.)

During this time, there were numerous records that he could not locate due to Delaney's actions.

(*Id.*)  While searching for records relevant to this case, Zamfotis found the files with the

Arbitration Agreements executed by Plaintiff.  (*Id.*)

      **b.   Procedural background**

Plaintiff filed a Complaint on December 29, 2020.  (Compl.)  Plaintiff seeks to represent

all non-exempt employees employed by Defendants on or after the date that is six years before

the filing of the Complaint, (the "FLSA Collective Plaintiffs").  (*Id.* ¶ 11.)  Plaintiff also seeks to

represent all such persons in a class action lawsuit under Federal Rule of Civil Procedure 23, (the

"Class").  (*Id.* ¶ 14.)

On January 4, 2021, Magistrate Judge Peggy Kuo ordered the parties to engage in

discovery and engage in early settlement discussions, or else be referred to formal mediation.

(Order dated Jan. 4, 2021, Docket Entry No. 9.)  On June 9, 2021, Plaintiff moved for

conditional certification of his FLSA claim as a representative collective action pursuant to 29

U.S.C. § 216(b).[3]  Defendants opposed the motion.[4]

On August 10, 2021, Defendants filed a motion for a pre-motion conference, seeking to

file a motion to dismiss the Complaint and to enforce arbitration.  (Mot. dated Aug. 10, 2021,

Docket Entry No. 25.)  On November 29, 2021, the Court ordered the Hearing on the validity

and unconscionability of the Arbitration Agreements and deferred ruling on all other arguments

presented by the parties.  (*See* November 2021 Order.)  The Court directed Judge Merkl to

conduct a Hearing "to determine whether the Arbitration Agreements are procedurally and/or

substantively unconscionable."  (November 2021 Order 15.)

Judge Merkl conducted the Hearing on January 13, 2022.  (Min. Entry dated Jan. 13,

2022).  On June 9, 2022, Judge Merkl issued the R&R, recommending that the Court find that

the Arbitration Agreements are valid and neither procedurally nor substantively unconscionable.

(*See* R&R 22.)  Plaintiff subsequently submitted a letter confirming that he would not be

objecting to the R&R and requesting that the Court rule on Defendants' outstanding motion to

compel arbitration and Plaintiff's cross-motion for sanctions.  (Pl.'s Letter dated June 13, 2022,

Docket Entry No. 52.)

---

[3]  (Pl.'s Mot. for Conditional Collective Certification, Docket Entry No. 20; Pl.'s Mem. in Supp. of Pl.'s Mot. for Conditional Collective Certification, Docket Entry No. 21; Pl.'s Reply in Supp. of Pl.'s Mot. for Conditional Collective Certification, Docket Entry No. 23.)  On March 31, 2022, the Court deferred ruling on Plaintiff's motion to certify an FLSA collective action until after the motion to compel arbitration is decided.  (Order dated Mar. 31, 2022.)

[4]  (Defs.' Opp'n to Pl.'s Mot. for Conditional Certification, Docket Entry No. 22; Defs.' Reply in Supp. of Defs.' Opp'n. to Pl.'s Mot. for Conditional Certification, Docket Entry No. 43.)

### c.   The Hearing

On January 13, 2022, Judge Merkl presided over the Hearing to determine whether the Arbitration Agreements are valid.  (Evid. Hr'g Tr. dated Jan. 13, 2022 ("Hr'g Tr."), Docket Entry No. 48.)

### i.   Testimony by George Zamfotis

Non-party George Zamfotis first testified that he was hired at Gregorys Coffee as a manager for the commissary "[a]bout fifteen years ago" and was one of the founders of the company.  (Hr'g Tr. 12–13, 22.)  Zamfotis had received arbitration agreements from his accountant, gave the forms to Alberto Vasquez, who "runs [t]he [c]ommissary," and Vasquez distributed them to the people who worked at the commissary.  (*Id.* at 15–16, 23, 34.)  Zamfotis' accountant sent him the arbitration agreements because one of his other clients had an "issue" where he did not have these documents.  (*Id.* at 21–22.)  Zamfotis testified that they did not make a Spanish version available because they only distributed the agreements that Zamfotis' accountant had given to him.  (*Id.* at 29.)  When Zamfotis gave Vasquez the forms, he told Vasquez to "make sure [the employees] unders[tood]" what the agreements meant.  (*Id.* at 16.)  He also told Vasquez to "give them the forms," but if the employees said that they did not want to sign them, "they didn't have to sign."  (*Id.* at 28.)  After the employees signed, Vasquez gave Zamfotis a copy of each agreement, Zamfotis signed the agreements and made copies, and then Zamfotis returned the agreements to Vasquez, who gave the originals back to the employees. (*Id.* at 37.)  If employees had questions about the content of the agreements, they could ask Vasquez, who would then ask Zamfotis, and Zamfotis testified that he "made [the arbitration agreements] very simple."  (*Id.* at 17.)  Employees could have also spoken to him directly about the agreements but they "never did."  (*Id.* at 26.)

Plaintiff did not come to Zamfotis at any point to express any concerns about the Arbitration Agreements or to speak about the Arbitration Agreements more generally. (*Id.* at 27, 39, 41.) Zamfotis never informed Plaintiff that he needed to sign them to continue to work for Gregorys Coffee. (*Id.* at 38.) Zamfotis understood that if there was any dispute, an "unbiased arbitrator . . . would decide" rather than a court. (*Id.* at 18.) If there had to be an arbitrator, Zamfotis testified that management would do research, get in touch with a lawyer, and find out the rules and how to pick an arbitrator. (*Id.* at 20.) Zamfotis was not sure how many employees signed the agreements and was not sure how many people worked at the commissary at the time that Plaintiff signed his Arbitration Agreements. (*Id.* at 22.) To his knowledge, the employees at the commissary were not required to sign the arbitration agreements to continue their employment. (*Id.* at 23.) The arbitration agreements did not inform employees that they did not have to sign the forms to continue their jobs. (*Id.*)

Zamfotis was unaware that Plaintiff did not speak English. (*Id.* at 24.) Plaintiff was a baker and Zamfotis gave Plaintiff recipes that had fifteen to twenty ingredients that he would follow in English. (*Id.*) "There were no interpreters" where Plaintiff worked and there was no Spanish writing in the commissary, therefore, Zamfotis thought that Plaintiff spoke English. (*Id.* at 31.) When presented with one of Plaintiff's wage notices in Spanish, Zamfotis stated that he could have given Plaintiff a Spanish form even if he spoke English as well because "the primary language could be Spanish." (*Id.* at 25.) Zamfotis became aware of the instant lawsuit in March or April of 2021. (*Id.* at 30.)

### ii.   Testimony by Gary Barnes

Gary Barnes is the chief of staff at Gregorys Coffee. (*Id.* at 45.) As chief of staff, he oversees build-outs, technology and innovation, and "new and ongoing projects within the

company." (*Id.* at 46.) He managed payroll "for quite a while" and also used to handle hiring and on-boarding but no longer does. (*Id.* at 47.) He is involved in some of the litigation for Gregorys Coffee. (*Id.*)

Barnes became aware of the instant lawsuit sometime between April and June of 2021 but has never worked with Plaintiff. (*Id.* at 48, 53.) Barnes was "asked to gather information regarding [Plaintiff's] claims" at the Gregorys Coffee offices and in his own electronic records. (*Id.* at 49.) Zamfotis provided documents that included one of the Arbitration Agreements around August of 2021 and Barnes gave it to Zamfotis and his team. (*Id.* at 50.) Prior to this, Barnes did not know that the Arbitration Agreements existed. (*Id.* at 51.) He never distributed the agreements and never had attorneys give them to him to provide to other employees. (*Id.* at 53–54.)

### iii.   Testimony by Alberto Vasquez

Vasquez is a manager at the commissary and has worked for Gregorys Coffee for seven years. (*Id.* at 56–57.) Zamfotis is his boss and delegates tasks to him. (*Id.* at 57.) Vasquez worked directly at the commissary with Plaintiff and spoke with him exclusively in Spanish. (*Id.* at 59.) All of the recipes that Vasquez provided to Plaintiff were in English and he stated that Plaintiff "speaks a little bit of working English." (*Id.* at 60.) He does not believe Plaintiff is fluent in English. (*Id.*)

Vasquez gave Plaintiff the 2018 Arbitration Agreement after Zamfotis asked him to have all employees sign the agreements. (*Id.* at 60–61.) Vasquez gave arbitration agreements out every year and all employees signed them. (*Id.* at 61.) Zamfotis had designated Vasquez as the person to answer employees' questions about the agreements. (*Id.*) Vasquez called everybody "one by one" into his office to explain the agreements. (*Id.* at 62.) When he called Plaintiff into

his office, he also gave him a form discussing his salary, which Vasquez did not explain because it was in Spanish.  (*Id.* at 64–65.)  Vasquez explained to Plaintiff that if Plaintiff had any dispute with the company, "no to the lawyers, no to the court, it's [going] to be arbitration."  (*Id.* at 61.) Plaintiff agreed to sign the Arbitration Agreements in 2018 and 2019.  (*Id.*)  Vasquez did not tell Plaintiff that he had to sign the Arbitration Agreements in order to continue to work at Gregorys. (*Id.* at 65.)  He also "never told him he could sign or not sign."  (*Id.* at 67.)

### iv.  Plaintiff's testimony

Plaintiff, through an interpreter, testified that he does not speak English and that most of the employees at the commissary did not speak English either.  (*Id.* at 73, 75.)  He would read English-language recipes at Gregorys Coffee by giving them to another employee, who would explain them, or by having Vasquez explain the recipes to him.  (*Id.* at 75.)  Plaintiff never spoke with Zamfotis during his employment and exclusively communicated with Vasquez.  (*Id.* at 78.)

Plaintiff remembered signing the 2018 Arbitration Agreement provided by Vasquez and noted that the bottom, where the employer was supposed to sign, was not filled out when he signed the document.[5]  (*Id.* at 72–73.)  He also signed the 2019 Arbitration Agreement provided by Vasquez.  (*Id.* at 74.)  He recalled that Vasquez handed the Arbitration Agreements to all of the workers in the kitchen rather than in an office and that they all signed them the same day. (*Id.* at 78, 81.)  Vasquez told him to "sign those papers so [he] could keep on working for [Gregorys]."  (*Id.* at 74.)  Vasquez said that if Plaintiff did not sign the papers, then he had to stop working.  (*Id.* at 81–82.)  Vasquez did not explain what the papers were even though

---

[5]  As Judge Merkl notes in the R&R, Plaintiff's declaration submitted prior to the Hearing asserted that he "d[id] not have any recollection of an [A]rbitration [A]greement being provided by Defendants" and that the first he "recall[ed] hearing of this [A]greement was from [his] attorneys."  (R&R 3 (quoting Pl.'s Decl. ¶ 4).)

Plaintiff asked him what the documents were both times Plaintiff was asked to sign them.  (*Id.*)
In addition, Vasquez never provided Plaintiff with fully executed copies of the Arbitration
Agreements after Zamfotis signed them and he never had the documents translated or asked for
translated copies.  (*Id.* at 79–80, 82.)

      **d.   The R&R**

      Judge Merkl noted in her recommendation that while Plaintiff is not fluent in English and
only "speak[s] and understand[s] some English," the Arbitration Agreements are not
procedurally unconscionable because an inability to understand the English language alone is
insufficient to void a contract under New York law.  (R&R 18.)  Further, Judge Merkl found that
Plaintiff has not established that (1) "Defendants used misleading or high-pressure tactics to
secure [his] signature [on the Arbitration Agreements]," (2) "Plaintiff was affirmatively misled
about the contents," or (3) Plaintiff "was denied an opportunity to review and ask questions
about them."  (*Id.* at 19.)  Judge Merkl also found that courts in this Circuit have determined that
including an arbitration agreement as a condition of employment does not render it procedurally
unconscionable.  (*Id.* at 20.)  Judge Merkl recommended that the Court find that the Arbitration
Agreements are not substantively unconscionable because Gregorys "is required to pay for the
costs of the arbitration" and both parties "are bound to the [A]rbitration [A]greements."  (*Id.* at
21.)  Accordingly, the Arbitration Agreements are valid.  (*Id.* at 22.)

      No objections to the R&R have been filed and the time for doing so has passed.  As noted
above, Plaintiff has indicated that he does not intend to oppose Judge Merkl's recommendation.
(*See* Pl.'s Letter dated June 13, 2022.)

## II.   Discussion

### a.   Standards of review

#### i.   R&R

A district court reviewing a magistrate judge's recommended ruling "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C).  "Where parties receive clear notice of the consequences, failure to timely object to a magistrate's report and recommendation operates as a waiver of further judicial review of the magistrate's decision."  *Smith v. Campbell*, 782 F.3d 93, 102 (2d Cir. 2015) (quoting *Mario v. P & C Food Mkts., Inc.*, 313 F.3d 758, 766 (2d Cir. 2002)); *see also Phillips v. Long Island R.R. Co.*, 832 F. App'x 99, 100 (2d Cir. 2021) (same); *Almonte v. Suffolk County*, 531 F. App'x 107, 109 (2d Cir. 2013) ("As a rule, a party's failure to object to any purported error or omission in a magistrate judge's report waives further judicial review of the point." (quoting *Cephas v. Nash*, 328 F.3d 98, 107 (2d Cir. 2003))); *Sepe v. N.Y. State Ins. Fund*, 466 F. App'x 49, 50 (2d Cir. 2012) ("Failure to object to a magistrate judge's report and recommendation within the prescribed time limit 'may operate as a waiver of any further judicial review of the decision, as long as the parties receive clear notice of the consequences of their failure to object.'" (first quoting *United States v. Male Juv.*, 121 F.3d 34, 38 (2d Cir. 1997); and then citing *Thomas v. Arn*, 474 U.S. 140, 155 (1985))); *Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C.*, 596 F.3d 84, 92 (2d Cir. 2010) ("[A] party waives appellate review of a decision in a magistrate judge's [r]eport and [r]ecommendation if the party fails to file timely objections designating the particular issue." (first citing *Cephas*, 328 F.3d at 107; and then citing *Mario*, 313 F.3d at 766)).

ii.   **The Federal Arbitration Act**

The Federal Arbitration Act (the "FAA") requires courts to compel arbitration of claims that the parties have agreed to arbitrate.  *See AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011).  "Courts consider two factors when deciding if a dispute is arbitrable: '(1) whether the parties agreed to arbitrate, and, if so, (2) whether the scope of that agreement encompasses the claims at issue.'"  *Cooper v. Ruane Cunniff & Goldfarb Inc.*, 990 F.3d 173, 179 (2d Cir. 2021) (quoting *Holick v. Cellular Sales of N.Y., LLC*, 802 F.3d 391, 394 (2d Cir. 2015)); *see Doctor's Assocs., Inc. v. Alemayehu*, 934 F.3d 245, 250 (2d Cir. 2019) ("The threshold question facing any court considering a motion to compel arbitration is . . . whether the parties have indeed agreed to arbitrate." (quoting *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 118 (2d Cir. 2012))).

Generally, "as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration."  *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983); *see also Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. BMC Stock Holdings, Inc.*, 796 F. App'x 45, 48 (2d Cir. 2019) (same).  When an agreement is clear, "it is the language of the contract that defines the scope of disputes subject to arbitration."  *E.E.O.C. v. Waffle House, Inc.*, 534 U.S. 279, 289 (2002); *see also Abdullayeva v. Attending Homecare Servs. LLC*, 928 F.3d 218, 222 (2d Cir. 2019) ("In answering the first question — whether the parties agreed to arbitrate — we look to 'state contract law principles.'" (quoting *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016))).

In deciding a motion to compel arbitration, courts apply a similar standard to that applied to a motion for summary judgment and "draw all reasonable inferences in favor of the non-moving party."  *Nicosia*, 834 F.3d at 229 (citing *Wachovia Bank, Nat'l Ass'n v. VCG*

13

*Special Opportunities Master Fund, Ltd.*, 661 F.3d 164, 171–72 (2d Cir. 2011); *Soliman v. Subway Franchisee Advert. Fund Tr., Ltd.*, 999 F.3d 828, 833–34 (2d Cir. 2021) (first quoting *Nicosia*, 834 F.3d at 229; and then quoting *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 74 (2d Cir. 2017)).  The party "seeking to avoid arbitration generally bears the burden of showing the agreement to be inapplicable or invalid."  *Harrington v. Atl. Sounding Co., Inc.*, 602 F.3d 113, 124 (2d Cir. 2010) (citing *Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 91–92 (2000)). In addition, "[a] district court must stay proceedings once it is 'satisfied that the parties have agreed in writing to arbitrate an issue or issues underlying the district court proceeding.'"  *Nicosia*, 834 F.3d at 229 (quoting *WorldCrisa Corp. v. Armstrong*, 129 F.3d 71, 74 (2d Cir. 1997)); *see also Katz v. Cellco P'ship*, 794 F.3d 341, 345 (2d Cir. 2015) ("[A] stay of proceedings [is] necessary after all claims have been referred to arbitration and a stay requested.").

> **b.   Unopposed R&R**

The Court has reviewed the unopposed R&R and, finding no clear error, adopts the R&R pursuant to 28 U.S.C. § 636(b)(1).  Consistent with Judge Merkl's decision in the R&R, the Court finds that the Arbitration Agreements are valid and neither procedurally nor substantively unconscionable.

The Court decides the other issues raised in the parties' briefing: (1) whether Defendants waived their right to arbitration, (2) whether Defendants acted with unclean hands, and (3) whether the Court should impose sanctions on Defendants.

> **c.   Waiver of right to arbitrate claims**

Defendants argue that Plaintiff must arbitrate his employment claims, (Defs.' Mem. 3–6), and that they have not waived their right to arbitrate, (Defs.' Reply 2–5).

Plaintiff argues that Defendants' prosecution of this action waives any contractual right to arbitrate Plaintiff's claims.  (Pl.'s Opp'n 3–8.)  Plaintiff also argues that a recent Supreme Court case, *Morgan v. Sundance, Inc.*, 142 S. Ct. 1708 (2022), supports his argument that Defendants waived the right to arbitrate.  (Pl.'s Letter dated May 25, 2022, Docket Entry No. 50.)

Federal policy strongly favors arbitration, and waiver of the right to arbitrate "is not to be lightly inferred."  *Nicosia*, 815 F. App'x at 614 (quoting *Thyssen, Inc. v. Calypso Shipping Corp., S.A.*, 310 F.3d 102, 104–05 (2d Cir. 2002) (per curiam)).  Indeed, "the rule preferring arbitration, when agreed upon, ha[s] led to its corollary that any doubts concerning whether there has been a waiver are resolved in favor of arbitration."  *Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading, Inc.*, 252 F.3d 218, 228 (2d Cir. 2001) (alteration in original) (quoting *Leadertex, Inc. v. Morganton Dyeing & Finishing Corp.*, 67 F.3d 20, 25 (2d Cir. 1995)).  Nevertheless, a party waives its right to arbitration "when it engages in protracted litigation."  *Tech. in P'ship, Inc. v. Rudin*, 538 F. App'x 38, 39 (2d Cir. 2013) (quoting *Crysen/Montenay Energy Co. v. Shell Oil Co.* (*In re Crysen/Montenay Energy Co.*), 226 F.3d 160, 162 (2d Cir. 2000)).

To determine whether a party has waived its right to arbitration, a court considers "(1) the time elapsed from when litigation was commenced until the request for arbitration" and "(2) the amount of litigation to date, including motion practice and discovery."[6]  *LifeTree Trading Pte.,*

---

[6] Until the Supreme Court's decision in *Morgan*, the Second Circuit also considered a third factor — whether there was prejudice to the party that did not move to compel arbitration. *See LifeTree Trading Pte., Ltd. v. Washakie Renewable Energy, LLC*, 764 F. App'x 105, 107 (2d Cir. 2019).  *Morgan* discussed the Eighth Circuit's two-pronged test for waiver, which considered whether (1) a party acted inconsistently with its right to arbitration and (2) whether it prejudiced the other party by its inconsistent actions.  *Morgan v. Sundance, Inc.*, 142 S. Ct. 1708, 1712 (2022).  The Supreme Court determined that a waiver analysis in the arbitration context cannot consider prejudice and remanded to the Eighth Circuit to determine whether the

*Ltd. v. Washakie Renewable Energy, LLC*, 764 F. App'x 105, 107 (2d Cir. 2019) (quoting *La.*

*Stadium & Expo. Dist. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 626 F.3d 156, 159 (2d Cir.

2010)); *Johnson v. Ensite USA, Inc.*, No. 21-CV-4437, 2022 WL 463381, at *4 (S.D.N.Y. Feb.

15, 2022) ("In determining whether [the] [d]efendant has waived its right to arbitration, the

[c]ourt considers such factors as '(1) the time elapsed from the commencement of litigation to

the request for arbitration [and] (2) the amount of litigation (including any substantive motions

and discovery)[.]'").  "There is no rigid formula or bright-line rule for identifying when a party

has waived its right to arbitration; rather, the above factors must be applied to the specific

context of each particular case." *La. Stadium & Expo. Dist.*, 626 F.3d at 159.  The Court

considers whether Defendants "knowingly relinquish[ed] the right to arbitrate by acting

inconsistently with that right" by considering the time elapsed and the amount of litigation to

date. *Morgan*, 142 S.Ct. at 1712.

### 1.   Time elapsed

Defendants contend that a delay of seven-and-a-half months between the filing of the

Complaint and the request for arbitration, even when rounding up, "is not even the outer limit of

what a court will permit without finding waiver."  (Def.'s Reply 3–5.)

Plaintiff argues that the approximately eight-month period between the filing of the

Complaint and Defendants' motion to compel arbitration favors waiver.  (Pl.'s Opp'n 4–5.)

It is well established that delay alone cannot support a finding of waiver in the context of

arbitration.  *See, e.g.*, *Thyssen, Inc.*, 310 F.3d at 105 (collecting cases and noting that "[t]his

---

defendant had "knowingly relinquish[ed] the right to arbitrate by acting inconsistently with that right," focusing on the other prong of the Eighth Circuit's traditional waiver test. *Id.* at 1714. Following *Morgan*, the Second Circuit has not ruled on whether a new standard applies to motions to compel arbitration.  Accordingly, the Court considers the other two elements traditionally used by the Second Circuit.  *See LifeTree*, 764 F. App'x at 107.

Circuit has refused to find waiver . . . where delay in trial proceedings was not accompanied by substantial motion practice or discovery"); *Rush v. Oppenheimer & Co.*, 779 F.2d 885, 887 (2d Cir. 1985) ("It is beyond question that defendants' delay in seeking arbitration during approximately eight months of pretrial proceedings is insufficient by itself to constitute a waiver of the right to arbitrate." (citing *Carcich v. Rederi A/B Nordie*, 389 F.2d 692, 696 (2d Cir. 1968))); *Chehebar v. Oak Fin. Grp., Inc.*, No. 14-CV-2982, 2017 WL 946292, at *2 (E.D.N.Y. Mar. 7, 2017) (collecting cases finding no waiver despite delays from four months to three years).

The eight-month period between the filing of the Complaint and Defendants' efforts in seeking arbitration, by itself, is insufficient to support a finding of waiver.  *See Rush*, 779 F.2d at 887; *In re Generali Covid-10 Travel Ins. Litig.*, --- F. Supp. 3d ---, ---, 2021 WL 6052127, at *8 (S.D.N.Y. 2021) ("Courts have found delays longer than a year . . . not to constitute waiver."); *Besara v. Hom*, No. 20-CV-3862, 2021 WL 2703351, at *4 (E.D.N.Y. July 1, 2021) ("Here, [the defendants] waited more than seven months to file a motion to compel arbitration, but '[i]t is beyond question that defendants' delay in seeking arbitration during approximately eight months of pretrial proceedings is insufficient by itself to constitute a waiver of the right to arbitrate.'" (quoting *Rush*, 779 F.2d at 887)); *cf. Leadertex*, 67 F.3d at 26 (finding seven months an undue delay where the party seeking arbitration had submitted several answers containing defenses, participated in discovery, and was preparing for an imminent trial); *Com-Tech Assocs. v. Computer Assoc.*, 938 F.2d 1574, 1576–77 (2d Cir. 1991) (finding waiver where a party sought to compel arbitration after filing a motion for summary judgment eighteen months after answering the complaint and after participating in discovery); *GateGuard, Inc. v. Goldenberg*, --- F. Supp. 3d ---, ---, 2022 WL 452637, at *3 (S.D.N.Y. 2022) (finding that twenty-two months

was a "significant length of time" for purposes of waiving arbitration).  In addition, all of the

delay is attributable to Defendants being unaware of the existence of the Arbitration Agreements.

*See McCants v. Team Electric, Inc.*, No. 19-CV-9565, 2021 WL 653122, at *5 (S.D.N.Y. Feb.

19, 2021) ("While approximately a year passed between commencement of the action and [the

defendant's] assertion of the [a]rbitration [a]greement, that is only because [the defendant] did

not learn of the agreement until reviewing documents it obtained . . . to produce to [the plaintiff].

. . . As noted, this is not a case where the defendant laid in wait, only to spring on the plaintiff an

arbitration agreement about which the defendant knew from the outset.").

The length of time elapsed does not weigh in favor of waiver.

## 2. Amount of litigation to date

Defendants argue that the parties have "not exchanged extensive discovery," Plaintiff has

only produced eight documents, and there have not been any substantive settlement discussions.

(Defs.' Reply 4.)  Defendants also argue that Plaintiff's motion for conditional certification, the

only briefing prior to the arbitration briefings, does not go to the merits of the litigation.

(*Id.* at 5.)

Plaintiff contends that the parties have exchanged "considerable" discovery, engaged in

court-ordered settlement negotiations, and fully briefed a motion for collective certification.

(Pl.'s Opp'n 5.)  Plaintiff further contends that in order to comply with the mandated settlement

negotiations, the parties exchanged all relevant employment documents.  (*Id.*)

In assessing the amount of litigation for purposes of a waiver analysis, courts consider,

*inter alia*, any motion practice engaged in by the parties and the extent of discovery that the

parties have exchanged.  *See, e.g.*, *Tech. in P'ship, Inc.*, 538 F. App'x at 39 (affirming district

court's finding of waiver where the party asserting waiver "had to defend two substantive

motions to dismiss, then produce its witness for deposition, comply with an extensive document request, and participate in extended discovery disputes"); *S & R Co. of Kingston v. Latona Trucking, Inc.*, 159 F.3d 80, 83 (2d Cir. 1998) (observing that the waiver analysis includes consideration of "the amount of litigation (including exchanges of pleadings, any substantive motions, and discovery)").  A party need not have made dispositive motions on the merits in order to be deemed to have waived arbitration.  *Id.* at 84.

The extent of discovery and other litigation activity prior to Defendant's pre-motion conference letter raising the issue of arbitration does not weigh in favor of a finding of waiver. There has not been "litigation of substantial issues going to the merits" of Plaintiff's claims, even considering the motion for conditional collective certification, as the motion does not implicate the merits of Plaintiff's claims.  *Com-Tech Assocs. v. Computer Assocs. Int'l, Inc.*, 938 F.2d 1574, 1576 (2d Cir. 1991) (quoting *Sweater Bee v. Manhattan Industries, Inc.*, 754 F.2d 457, 461 (2d Cir. 1985)); *see DeSimone v. TIAA Bank, FSB*, No. 20-CV-6492, 2021 WL 4198274, at *6 (S.D.N.Y. Sept. 14, 2021) ("[The] [p]laintiffs have not shown that they expended significant resources on discovery or otherwise litigating the claims at issue during this time."); *Chen-Oster v. Goldman, Sachs & Co.*, 449 F. Supp. 3d 216, 236 (S.D.N.Y. 2020) (finding that even the forty-four briefed motions, one hundred letters, twenty-six court appearances, and "hundreds of thousands of pages of discovery production" did not disfavor arbitration and did not support finding waiver).  Since Plaintiff filed the Complaint, Defendant has filed an Answer (Answer, Docket Entry No. 14), Plaintiff filed a motion for conditional collective certification, and the parties have been ordered to engage in "early settlement discussions," but there have not been

any settlement conferences with the Court or Court mediators,[7] (Order dated Jan. 4, 2021).  In addition, the parties have not deposed anyone, (Defs.' Reply 4 (citing Pl.'s Counsel Bills, annexed to Pl.'s Opp'n as Ex. C, Docket Entry No. 36-3)), and it is unclear how many documents have been produced or the extent of production.  While Defendants claim that eight documents have been produced, Plaintiff contends that the parties have "exchanged considerable discovery."[8]  (Pl.'s Opp'n 5.)  Nevertheless, accepting Plaintiff's arguments that the parties have exchanged considerable discovery, it does not establish waiver since engaging in pretrial discovery, by itself, is insufficient to establish waiver.  *See McClain v. Rochdale Village*, No. 18-CV-3781, 2021 WL 3023087, at \*5 (E.D.N.Y. July 16, 2021) ("Thus, while [d]efendants first raised the prospect of arbitration in their [a]nswer, they waited to move to compel arbitration until after the parties had engaged in discovery and failed to reach an agreement at mediation nearly two years after the action was commenced.  While the [c]ourt struggles to understand why [d]efendants waited so long to pursue arbitration, this alone does not establish waiver." (citing *Rush*, 779 F.2d at 891)); *Tr. of Loc. 531 Pension Fund v. Al Turi Landfill, Inc.*, No. 08-CV-1272, 2010 WL 11627389, at \*4 (E.D.N.Y. Sept. 20, 2010) (finding no waiver of arbitration where "no

---

[7]  *See Satcom Int'l Grp. PLC v. Orbcomm Int'l Partners, L.P.*, 49 F. Supp. 2d 331, 340 (S.D.N.Y. 1999) (considering settlement conference in assessing amount of litigation), *aff'd*, 205 F.3d 1324 (2d Cir. 1999); *see also NV Petrus SA v. LPG Trading Corp.*, No. 14-CV-3138, 2017 WL 1831096, at \*3 (E.D.N.Y. May 4, 2017) (considering, *inter alia*, the parties' participation in court-sponsored mediation and concluding that the defendants "actively engaged in 'protracted litigation'"); *cf. S & R Co. of Kingston v. Latona Trucking, Inc.*, 159 F.3d 80, 84 (2d Cir. 1998) (affirming district court's finding of waiver based on, *inter alia*, "extensive discovery requests" and "two settlement conferences").

[8]  Other than through viewing the bills for Plaintiff's counsel, the Court cannot determine from the information in the record which documents have been exchanged, or the extent of discovery, (Pl.'s Ex. C), but Plaintiff's legal bills do not support a conclusion that substantive discovery has taken place.

depositions have occurred, and no substantive motions were filed" until after defendant's motion to compel arbitration).

Viewing the facts in the light most favorable to Plaintiff, and mindful that "[w]aiver is not to be lightly inferred," *Nicosia*, 815 F. App'x at 614 (quoting *Thyssen, Inc.*, 310 F.3d at 104–05), the amount of litigation does not weigh in favor of waiver.

Thus, neither the length of time elapsed nor the amount of litigation favors waiver and the Court therefore grants Defendants' motion to compel arbitration.

### d.   Unclean hands

Plaintiff argues that Defendants' hands have been sullied, as they have known about the Arbitration Agreements since the start of the lawsuit, "can proffer no argument of good faith for this late production," and have improperly coerced employees into signing agreements without proper knowledge.  (Pl.'s Opp'n 12–13.)

Defendants argue that Plaintiff has not showed that Defendants had unclean hands, as the Arbitration Agreements were only used in the commissary and were not distributed companywide, and Gregorys Coffee did not delay in handing over these agreements.  (Defs.' Reply 14–15.)

It is well established that "he who comes into equity must come with clean hands."  *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814 (1945); *Hermes Int'l v. Lederer de Paris Fifth Ave., Inc.*, 219 F.3d 104, 107 (2d Cir. 2000) (same). "Courts apply the maxim requiring clean hands where the party asking for the invocation of an equitable doctrine has committed some unconscionable act that is directly related to the subject matter in litigation and has injured the party attempting to invoke the doctrine."  *Alonso Vazquez v. Azoulay*, 834 F. App'x 653, 655 (2d Cir. 2021) (quoting *PenneCom B.V. v. Merrill Lynch & Co.*, 372 F.3d 488, 493 (2d Cir. 2004)).  The doctrine of "unclean hands" is premised on the

maxim that a party "who has acted fraudulently, or who by deceit or any unfair means has gained an advantage" is not entitled to "obtain equitable relief." *PenneCom*, 372 F.3d at 493; *Genger v. Genger*, 76 F. Supp. 3d 488, 502 (S.D.N.Y. 2015) ("'The doctrine of unclean hands applies when the complaining party shows that the offending party is guilty of immoral, unconscionable conduct and even then only when the conduct relied on is directly related to the subject matter in litigation and the party seeking to invoke the doctrine was injured by such conduct.'" (quoting *Kopsidas v. Krokos*, 742 N.Y.S.2d 342, 344 (2002))); *see also Nat'l Distillers & Chem. Corp. v. Seyopp Corp.*, 17 N.Y.2d 12, 15–16 (1966) ("[The unclean hands doctrine] is never used unless the plaintiff is guilty of immoral, unconscionable conduct and even then only when the conduct relied on is directly related to the subject matter in litigation and the party seeking to invoke the doctrine was injured by such conduct." (internal quotation marks omitted)).

The record does not support Plaintiff's claim of unclean hands. Defendants submitted a signed and sworn declaration describing the reasons why they did not find the Arbitration Agreements until August of 2021. (*See* Barnes Decl. ¶¶ 6–11.) During the Hearing, Barnes further testified that Zamfotis provided documents that included the Arbitration Agreements around August of 2021 and he gave them to Zamfotis and his team. (Hr'g Tr. at 50.) Prior to this, Barnes did not know that the Arbitration Agreements existed. (*Id.* at 51.) These facts do not support any inference that Defendants acted with unclean hands. *See CBF Industria de Gusa S/A v. AMCI Holdings, Inc.*, 850 F.3d 58, 78 (2d Cir. 2017) (finding that a finding of unclean hands exerts the equitable powers of the Court "[o]n behalf of one who has acted fraudulently, or who by deceit or any unfair means has gained an advantage" (quoting *PenneCom*, 372 F.3d at 493) (internal quotation marks, brackets, and citations omitted)).

### e. Attorneys' Fees

Plaintiff claims that because Defendants "make no excuse and provide no reason for their delayed production of this agreement," Defendants must cover the costs of litigation and the Court should impose sanctions on Defendants through Rule 11 or the inherent powers of the Court. (Pl.'s Opp'n 14.) Plaintiff also argues that Defendants' affidavit never claims that Plaintiff's documents were lost, that the documents were searched for prior to August of 2021, that Plaintiff's documents were difficult to locate, or that the Arbitration Agreements were not known to the former and current manager of the Warehouse. (*See* Pl.'s Reply 6.)

Defendants argue that immediately after Plaintiff raised the issue of waiver, Defendants provided the Court with an "affidavit explaining why the [Arbitration] [A]greements were not immediately known to Gregorys . . . and its attorneys." (Defs.' Reply 16–17.)

Rule 11 provides that a court may impose sanctions either by motion or by its own initiative when (1) a pleading, written motion, or other paper is "presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;" (2) the claims, defenses, and other legal contentions raised are not "warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law;" (3) the factual contentions do not have any evidentiary support or are unlikely to have any evidentiary support after a reasonable opportunity for further investigation or discovery; or (4) the denials of factual contentions are not warranted on the evidence or are not "reasonably based on belief or a lack of information." Fed. R. Civ. P. 11(b)–(c); *see also Goldman v. Barrett*, 825 F. App'x 35, 39 (2d Cir. 2020) ("If a party violates Rule 11, the district court 'may impose an appropriate sanction.'" (quoting Fed. R. Civ. P. 11(c)(1))); *Ipcon Collections LLC v. Costco Wholesale Corp.*, 698 F.3d 58, 63 (2d Cir. 2012) ("Sanctions may be

— but need not be — imposed when court filings are used for an 'improper purpose,' or when claims are not supported by existing law, lack evidentiary support, or are otherwise frivolous." (quoting Fed. R. Civ. P. 11(b)–(c))).  "[E]ven when a district court finds a violation of Rule 11, 'the decision whether to impose a sanction for a Rule 11(b) violation is . . . committed to the district court's discretion.'"  *Ipcon Collections*, 698 F.3d at 63 (quoting *Perez v. Posse Comitatus*, 373 F.3d 321, 325 (2d Cir. 2004)); *see also Cartwright v. D'Alleva*, 782 F. App'x 77, 78 (2d Cir. 2019) (concluding that a district court did not abuse its discretion in affording deference to the plaintiff's pro se status in denying the motion for sanctions).  Enforcing Rule 11 requires "notice and a reasonable opportunity to respond," and "[a] motion for sanctions must be made separately from any other motion and must describe the specific conduct that allegedly violates Rule 11(b)."  Fed. R. Civ. P. 11(c).

In addition, a court has the inherent power to sanction a party "for conduct which abuses the judicial process."  *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44–45 (1991); *Ceglia v. Zuckerberg*, 600 F. App'x 34, 36 (2d Cir. 2015) ("A court has 'inherent power' to 'fashion an appropriate sanction for conduct which abuses the judicial process.'" (quoting *Chambers*, 501 U.S. at 44–45)).  "Because of their very potency, inherent powers must be exercised with restraint and discretion."  *Chambers*, 501 U.S. at 44 (citing *Roadway Exp., Inc. v. Piper*, 447 U.S. 752, 764 (1980)); *United States v. HSBC Bank USA, N.A.*, 863 F.3d 125, 136 (2d Cir. 2017) (quoting *Chambers*, 501 U.S. at 44).  "Sanctionable conduct must be proven by clear and convincing evidence and the district court must make a specific finding of bad faith."  *Amerisource Corp. v. RX USA Int'l Inc.*, No. 02-CV-2514, 2010 WL 2730748, at *5 (E.D.N.Y. July 6, 2010) (citing *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 136 (2d Cir. 1998)), *aff'd* 432 F. App'x 25 (2d Cir. 2011); *see also Yukos Cap. S.A.R.L. v. Feldman*, 977 F.3d

216, 235 (2d Cir. 2020) ("[C]lear and convincing evidence of bad faith is a prerequisite to an award of sanctions under the court's inherent power.").  "Moreover, inherent-power sanctions are appropriate only if there is clear evidence that the conduct at issue is (1) entirely without color and (2) motivated by improper purposes." *Wolters Kluwer Fin. Servs. Inc. v. Scivantage*, 564 F.3d 110, 114 (2d Cir. 2009); *Huebner v. Midland Credit Mgmt., Inc.*, 897 F.3d 42, 56 (2d Cir. 2018) (quoting *Wolters Kluwer Fin. Servs. Inc.*, 564 F.3d at 114).  "Clear and convincing evidence is evidence that makes the fact to be proved 'highly probable.'" *RKI Constr., LLC v. WDF Inc.*, No. 14-CV-1803, 2020 WL 6545915, at *21 (E.D.N.Y. Nov. 6, 2020) (quoting *Abernathy-Thomas Eng'g Co. v. Pall Corp.*, 103 F. Supp. 2d 582, 595–96 (E.D.N.Y. 2000)).  "A finding of bad faith, and a finding that conduct is without color or for an improper purpose, must be supported by a high degree of specificity in the factual findings." *Wolters Kluwer Fin. Servs. Inc.*, 564 F.3d at 114.

Defendants' conduct does not merit sanctions.  Barnes stated that while searching for time records relevant to this case, Zamfotis found files that included the Arbitration Agreements. (Barnes Decl. ¶ 8.)  Barnes also provides in his declaration an explanation of why numerous records could not be located, namely a change in staffing and actions taken by one employee to rearrange documents prior to his departure from the company.  (*Id.* ¶¶ 7–8.)  Plaintiff's assertions that Defendants were either "negligen[t] or malic[ious]," (Pl.'s Reply 8), by failing to locate this information before filing an Answer, are not supported by the record.  While Plaintiff claims that Zamfotis must have known about the Arbitration Agreements previously, as he oversees them, (Pl.'s Opp'n 15), Defendants have clarified that the agreements were signed by non-party George Zamfotis, who testified at the Hearing, (Defs.' Reply 17).  The fact that Defendants' Answer "fails to even admit that Plaintiff was Defendants' employee" does not demonstrate that there

was no inquiry into Plaintiff's claim, as Plaintiff speculates, much less imply that there was

harassment or frivolity that would warrant the Court's imposition of sanctions.  (Pl.'s Reply 8.)

Defendants' conduct "has some legal and factual support, considered in light of the reasonable

beliefs of the attorney whose conduct is at issue," *Wolters Kluwer Fin. Servs. Inc.*, 564 F.3d at

114, and there is no "clear showing of bad faith," *Oliveri v.* Thompson, 803 F. 2d 1265, 1273 (2d

Cir. 1986).  There is no indication that Defendants engaged in "conduct which abuse[d] the

judicial process," *Chambers*, 501 U.S. at 44–45, and there is no clear and convincing evidence of

Defendants' bad faith, *see Yukos Cap.*, 977 F.3d at 235.  Further, Defendants' conduct did not

fall into the four-pronged test set forth by Rule 11.  *See Goldman*, 825 F. App'x at 39 (describing

factors for determining when Rule 11 applies); *Levine v. N.Y.S. Police*, No. 21-CV-1181, 2022

WL 1987845, at *8 (N.D.N.Y. June 6, 2022) ("Therefore,[the defendant's] motion to compel is

not frivolous, and the [c]ourt denies [p]laintiff's request for punitive damages and sanctions.").

     Accordingly, the Court denies Plaintiff's cross-motion for sanctions.

**III.   Conclusion**

     For the foregoing reasons, the Court grants Defendants' motion to compel arbitration and

denies Plaintiff's cross-motion for sanctions.  The Court stays this proceeding.  The parties are

directed to provide the Court with monthly status updates.

Dated: August 4, 2022
      Brooklyn, New York

                      SO ORDERED:

                      _____s/ MKB_____
                      MARGO K. BRODIE
                      United States District Judge